Jeannie GRINNELL, et al., Appellants,

v.

The AMERICAN TOBACCO COMPANY, INC., Appellee.

No. 09–93–039 CV.

Court of Appeals of Texas, Beaumont.

Submitted Feb. 17, 1994.

Decided Sept. 29, 1994.

Rehearing Overruled Nov. 17, 1994.

David B. Gaultney, Dewey J. Gonsoulin, Mehaffy & Weber, Beaumont, for appellant.

Sam Cruse, Jr., Cruse, Scott, Henderson & Allen, Houston, Hubert Oxford, III, Benckenstein, Oxford & Johnson, Beaumont, for appellee.

Before WALKER, C.J., and BROOKSHIRE and BURGESS, JJ.

## OPINION

BROOKSHIRE, Justice.

This legal proceeding was originally filed by Wiley Grinnell, Jr., and his wife, Jeannie Grinnell. The Grinnells pleaded to recover damages for personal injuries and personal damages allegedly suffered by Wiley Grinnell, Jr. These personal injuries and damages were said to be the result of smoking

cigarettes which were designed, manufactured, marketed, and sold by the defendant-appellee.

In July of 1985, Grinnell, Jr., an original plaintiff, was diagnosed by medical doctors as having lung cancer. This suit was then filed on October 9, 1985. Wiley Grinnell, Jr., was deposed at some length on April 30, 1986. Later that year in late May, Grinnell, Jr., died.

The plaintiffs' first amended petition was filed on April 1, 1987, by his surviving widow, Jeannie. Jeannie had been appointed and qualified as independent executrix of the estate of her husband. Grinnell, Jr.'s surviving parents were added as plaintiffs as was his surviving adult son, Kevin. By these first amended pleadings the plaintiffs sought to recover actual and punitive damages under several theories and under the Texas Wrongful Death Act as well as under the Texas Survival Statute.

In late May of 1987 the trial court granted to the appellee a partial summary judgment. This partial summary judgment dealt with the plaintiffs' various claims which had challenged the adequacy of a congressionally mandated statute and warnings as well as the propriety of the appellee's advertising and promotional practices from and after the date of January 1, 1966.

Then in mid-April of 1989 the trial judge granted the appellee's later filed motion for partial summary judgment, dismissing the plaintiffs' claims that arose as post–1965 claims. These summary judgments were partial summary judgments only and because of the nature of the suit below and because of the wording of the partial summary judgments, neither of these partial judgments was final or appealable.

Later in the first week of January, 1993, the trial court considered the appellee's renewed motion for summary judgment. This later-filed renewed motion attempted to cover all of the plaintiffs' causes of action and sought to dismiss the entirety of the causes of action that were pleaded in the plaintiffs' third amended original petition. The trial court entered a nunc pro tunc order and then entered an amended order in the latter part of January 1993 which granted the tobacco company's renewed motion for summary judgment and on January 29, 1993, the trial court dismissed all of the plaintiffs' claims and causes of action and pleaded grounds for relief. This action of January 29, 1993, was a final judgment and an appealable judgment. This appeal was timely and properly perfected.

This appellate proceeding now before us seeks relief from the orders entered by the trial court and especially from the final, appealable order of January 29, 1993. Another defendant below, namely, Price & Company was dismissed out of the lawsuit. Price & Company was not named in the plaintiffs' second amended original petition. The record before us clearly reflects that the defendants, The American Tobacco Company (ATC) and American Brands, Inc., are actually one and the same company; therefore, this is an appeal from a final judgment below.

The appellants bring five points of error. Appellants properly group point of error number one and point of error number two. Point of error number one states the trial court erred in granting the appellee's motion for partial summary judgment in respect to all of the appellants' claims challenging the adequacy of the congressionally mandated warnings and the propriety of The American Tobacco Company's advertising and promotional practices beginning and since January 1, 1966. The second point of error is similar to the first. The second point states the trial court erred in granting the appellee's motion for summary judgment dismissing all of the appellants' post–1965 claims. Concededly, however, point of error number two is much broader in scope than point of error number one.

Within about three months after Wiley Grinnell, Jr., had been correctly diagnosed with lung cancer, his original petition was filed. In this first pleading the plaintiffs below alleged that this action arose out of the illness of lung cancer suffered and sustained by Grinnell, Jr., caused by cigarette smoking. Grinnell's condition was described as a progressive condition and the petition affirmatively set out that the causation and cause or

causes of Grinnell's lung cancer was brought about and contributed to by cigarettes manufactured, designed, marketed, and sold by the defendant.

In the original pleadings, the first plaintiffs below allege various theories of liability and various causes of action including civil conspiracy, intentional wrongs, intentional torts, negligence, gross negligence, fraud, and unconscionable conduct; each of which and all of which resulted in actual damages as well as punitive damages to Grinnell, Jr.

In the first amended original petition, the numerous plaintiffs alleged that the defendant knew, or in the exercise of ordinary care and diligence, should have known that the cigarettes that it had designed, manufactured, marketed and sold were dangerous products and contained dangerous ingredients and harmful substances capable of causing injury and death to the intended consumers of its cigarette products, which consumers used these products in the manner intended to be used.

The plaintiffs additionally set forth that the defendant knew or should have known that the cigarettes it made could not be used safely; but, nevertheless, the manufacturer represented to the users of its cigarettes that the cigarettes were not harmful, that the cigarettes were not dangerous, and the cigarettes were not capable of causing injury or death to the users. On the contrary, it was alleged that the manufacturer made every effort to conceal and to hide certain material facts concerning the dangers of and the defects of the cigarettes made by ATC. The manufacturer made no effort to remove the toxic substances and the dangerous substances from its products although it knew of said toxic and dangerous substances or should have known of the same.

Fraud was pleaded against the defendant below in that it had designed and manufactured and sold defective products which were unreasonably dangerous when used by users in the cigarettes intended use; and therefore, the defendant was responsible for damages caused by such dangerous and defective products.

The plaintiffs in this additional pleading invoke the doctrine of strict liability, pleading under section 402A of the RESTATEMENT (SECOND) OF TORTS as the same was adopted by the Supreme Court of Texas. In addition, the plaintiffs alleged that the defendant (manufacturer) had expressly and impliedly warranted to the public as well as to Grinnell, Jr., that its product, the cigarettes, were of merchantable quality and that the cigarettes were safe and the cigarettes were fit for their intended use and fit for the purpose for which they were intended to be used under ordinary conditions and in an ordinary manner. The pleadings stated that Grinnell, Jr., relied upon these express and implied warranties and suffered injury and actual death as a proximate result of the breach of these implied warranties and express warranties.

There was a count of negligence stating that the defendant below was negligent in the design of and in the manufacture of and in the marketing of its cigarettes.

The defendant, ATC, after answering the plaintiffs' pleadings filed a motion for partial summary judgment. This first motion addressed the plaintiffs' claims with respect to smoking and health wherein the plaintiffs challenged the adequacy of the warnings placed on cigarette packages pursuant to the Federal Cigarette Labeling and Advertising Act, 15 U.S.C. §§ 1331–1340. And ATC attacked the plaintiffs' challenging of the propriety of the tobacco company's actions with respect to the advertising and promotion of the cigarettes. The tobacco company alleged that all of such claims of the plaintiffs were preempted by the Federal Cigarette Labeling and Advertising Act.

The plaintiffs filed a response to such motion for partial summary judgment. The trial court considered the matter and later entered an order granting the defendants' motion for partial summary judgment disallowing all of the plaintiffs' claims challenging the adequacy of the congressionally mandated warnings on cigarette packages and the propriety of ATC's advertising and promotions since the date of January 1, 1966.

Subsequent to the action in January of 1966, in February of 1989 ATC filed another

motion for summary judgment to dismiss all of the plaintiffs' post–1965 claims. This later pleading was based on the ground that all such claims were totally preempted by the Federal Cigarette Labeling and Advertising Act. The plaintiffs filed a response and filed their second amended original petition. On April 11, 1989, the trial court signed and entered an order granting the defendant's motion for summary judgment which dismissed all of the plaintiffs' post–1965 claims.

■ Summary judgments are reviewed *de novo* in accordance with the following standards:

1. The movant for summary judgment has the burden of showing that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law.

2. In deciding whether or not there is a disputed material fact issue precluding summary judgment, evidence favorable to the non-movant will be taken as true; and

3. Every reasonable inference must be indulged in favor of the non-movant and any doubts resolved in his favor.

*Nixon v. Mr. Property Management*, 690 S.W.2d 546, 548–549 (Tex.1985); *Turboff v. Gertner, Aron & Ledet, Inv.*, 763 S.W.2d 827, 829 (Tex.App.—Houston [14th Dist.] 1988, writ denied). Moreover, the usual presumption that the judgment is correct does not apply. *See Montgomery v. Kennedy*, 669 S.W.2d 309, 311 (Tex.1984); *Great American R. Ins. Co. v. San Antonio Pl. Sup. Co.*, 391 S.W.2d 41, 47 (Tex.1965).

Justice Doggett speaking and writing for an unanimous Supreme Court of Texas in *Acker v. Texas Water Com'n*, 790 S.W.2d 299, 302 (Tex.1990), wrote and held as follows:

In the review of a summary judgment, the movant has the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Evidence favorable to the non-movant will be taken as true when deciding whether a material fact issue exists. All reasonable inferences must be indulged in favor of the non-movant and

any doubts resolved in its favor. *Nixon v. Mr. Property Management Co.*, 690 S.W.2d 546, 548–49 (Tex.1985).

■ ATC in each of its first two motions seeking partial summary judgment relief, argued to the trial judge that the Federal Cigarette Labeling and Advertising Act as it was first enacted in 1965 and which became into full force and effect as of January 1, 1966, actually preempted all of the plaintiffs' claims and causes of action of whatever type or description or based upon whatever theory for any damages or injuries that occurred after January 1, 1966.

ATC argued that the Federal Cigarette Labeling and Advertising Act had mandated a certain type of specific warning to be used on cigarette packages. ATC maintained that the federal act prohibited states from requiring any other warning or statement relating to the smoking problems or the health problems involved in any advertising or advertising scheme or any promotion of cigarettes. Very interesting and significant is the warning label as originally required by Congress is 1965. The so-called warning label read:

"Warning: Cigarette Smoking May Be Hazardous to Your Health."

This language was amended by Congress in 1969 to provide:

"Warning: The Surgeon General Has Determined That Cigarette Smoking is Dangerous to Your Health."

Apparently the Congress determined that the first warning was not adequate.

The appellee, in support of its contention that all claims after January 1, 1966, were preempted, cited *Cipollone v. Liggett Group, Inc.*, 789 F.2d 181 (3rd Cir.1986), *cert. denied*, 479 U.S. 1043, 107 S.Ct. 907, 93 L.Ed.2d 857 (1987). We note that the trial judge did not have the benefit of later decisions and opinions involving Rose Cipollone. But the appellee's major reliance upon the 1986 decision of the Third Circuit Court is not sound.

Rose Cipollone had filed a complaint in 1983 in a federal court. The suit was based on diversity of citizenship. She alleged that she developed lung cancer because she had smoked cigarettes since 1942 which ciga-

rettes had been designed, manufactured and sold by three different defendants. After her death in 1984, her husband filed an amended complaint in federal court and after the husband's death, their son Thomas filed an amended complaint.

Thomas Cipollone alleged in his complaint that the defendant-manufacturers were responsible for his mother's death because they breached express warranties contained in their advertising and in their promotional programs and because they failed to warn consumers of the hazards of smoking. Thomas pleaded other allegations concerning fraudulent misrepresentation and he alleged that the defendants had conspired to deprive the public of certain medical and scientific information about smoking.

Thomas relied upon several different causes of action, including strict liability, negligence, express warranty, and intentional tort. The defendants, as against Thomas, pleaded that the Federal Cigarette Labeling Act enacted in '65 and its successor, known as the Public Health Cigarette Smoking Act of 1969, protected them from any liability based on their conduct after 1965, which is the position taken by the appellee in this appeal sub judice.

At a later time the case was tried on its merits and after a jury verdict, the Thomas Cipollone case was again appealed. The United States Supreme Court eventually granted a writ of certiorari. In *Cipollone v. Liggett Group, Inc.*, 505 U.S. ——, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992), the Supreme Court of the United States rejected a number of contentions and allegations that were made by the appellee in this appeal. We perceive that the basic, bare-bones decision in Thomas Cipollone's case was that the Federal Cigarette Labeling and Advertising statutes preempted some, but certainly not all, of state-law damages claims with respect to the smoking of cigarettes.

Inter alia, the United States Supreme Court held:

(1) that the 1965 Act did not preempt state-law damages claims against cigarette manufacturers and sellers;

(2) that § 5(b) of the 1969 Act preempted state-law damages claims against cigarette manufacturers and sellers, where such claims were based on theories of

(a) failure to provide a warning sufficient to make a product reasonably safe, suitable, and fit for its intended use, to the extent (but only to the extent) that a claim required a showing that the manufacturers' and sellers' post-1969 advertising or promotions ought to have included additional, or more clearly stated, warnings of the health consequences of cigarette smoking, and

(b) that also preempted were claims based on fraudulent misrepresentations but only to the extent that this theory was based on allegations that the manufacturers and sellers, through their advertising, neutralized the effect of federally mandated warning labels, in alleged violations of state-law prohibitions against statements in advertising and promotional materials that tended to minimize the health hazards associated with smoking, and that

(3) the 1969 Act did not preempt state-law damages claims against manufacturers and sellers to the extent that such claims were viable under state law where such claims were based upon theories of

(a) failure to provide a warning sufficient to make a product reasonably safe, suitable, and fit for its intended use, to the extent that a claim relied on the manufacturers' and sellers' testing or research practices or other actions unrelated to advertising or promotion;

(b) that the breach of an express warranty that goods conform to an affirmation of a fact or promise relating to such goods even if the evidence of the alleged warranty consists largely of statements made in the manufacturers' and sellers' advertising, and

(c) intentional fraud and misrepresentation by alleged concealment of material facts, insofar as this theory of recovery relied on a state-law duty to disclose such facts through channels of communication other than advertising or promotion,

(d) nor did it preempt intentional fraud and misrepresentation by making allegedly false statements of material facts in advertising and promotions, or

(e) the 1969 Act did not preempt state-law damages claims based on an alleged conspiracy among the manufacturers and sellers to misrepresent or conceal material facts concerning the health hazards of smoking.

The actions dealt with in (a) through (e) were not preempted.

Justice Stevens in *Thomas Cipollone* reasoned that his Court must construe the provisions of the warning provisions of the 1965 Act *in light of the presumption against the preemption of state police power regulations.* Justice Stevens wrote that the regulatory actions of the Federal Trade Commission (FTC) and state requirements animated the passage of § 5 of the 1965 Act. Section 5 reflected Congress' efforts to prevent a multiplicity of state and local regulations pertaining to the labeling of cigarette packages— thus, to preempt and disallow federal state and local authorities from requiring any statement relating to cigarettes and smoking and health in the advertising of cigarettes.

The Court then stated that § 5 of the 1965 Act only preempted state and federal rulemaking bodies from mandating particular cautionary statements and did not, therefore, preempt state-law damages actions.

The Public Health Cigarette Smoking Act of 1969 enacted a preemption of plaintiffs' claims based on a failure to warn and the attempted neutralization of a federally mandated warning to the extent—*but only to the extent*—that these claims rely on omissions or inclusions in the tobacco manufacturer's advertising of cigarettes or its promotions. Nextly, the Public Health Cigarette Smoking Act of 1969 failed to preempt the plaintiffs' claims based on express warranty, intentional fraud, intentional tort, misrepresentation or conspiracy. We quote from Thomas Cipollone:

To summarize our holding: The 1965 Act did not pre-empt state law damages actions; the 1969 Act pre-empts petitioner's claims based on a failure to warn and the neutralization of federally mandated warnings to the extent that those claims rely on omissions or inclusions in respondents' advertising or promotions; the 1969 Act does not pre-empt petitioner's claims based on express warranty, intentional fraud and misrepresentation, or conspiracy.

The Supreme Court in *Cipollone* also took note that the Act does not generally preempt state law obligations to avoid the marketing or selling of cigarettes with manufacturing defects or to use a demonstrably safer alternative design for cigarettes. Concerning the plaintiffs' claims herein and under *Cipollone* for a breach of an express warranty, the Supreme Court held that such claims were not preempted by the 1969 Act for the reason that:

A manufacturer's liability for breach of an express warranty derives from, and is measured by, the terms of that warranty. Accordingly, the "requirements" imposed by a [sic] express warranty claim are not "imposed under State law," but rather imposed *by the warrantor.* If, for example, a manufacturer expressly promised to pay a smoker's medical bills if she contracted emphysema, the duty to honor that promise could not fairly be said to be "imposed under state law," but rather is best understood as undertaken by the manufacturer itself. While the general duty not to breach warranties arises under state law, the particular "requirement . . . based on smoking and health . . . with respect to the advertising or promotion [of] cigarettes" in an express warranty claim arises from the manufacturer's statements in its advertisements. In short, a common law remedy for a contractual commitment voluntarily undertaken should not be regarded as a "requirement . . . *imposed under State law*" within the meaning of § 5(b).

That the terms of the warranty may have been set forth in advertisements rather than in separate documents is irrelevant to the pre-emption issue (though possibly not to the state law issue of whether the alleged warranty is valid and enforceable) because although the breach of warranty claim is made "with respect to advertising" it does not rest on a duty imposed under

state law. Accordingly, to the extent that petitioner has a viable claim for breach of express warranties made by respondents, that claim is not pre-empted by the 1969 Act. (footnotes omitted) (italic emphasis theirs) (underlined emphasis ours)

The Court reasoned that the petitioner's claims in *Cipollone* of fraudulent misrepresentation that arise with respect to advertising and promotions are not preempted by section 5(b). Such claims, the High Court reasoned, were based on a general obligation and a general duty not to deceive and this understanding and interpretation of fraud by intentional misstatement is appropriate for a number of reasons.

In the 1969 Act Congress offered no sign that it wished to insulate cigarette manufacturers from long-standing rules governing fraud. Indeed, to the contrary, both the 1965 and the 1969 congressional Acts explicitly reserve the FTC's authority to identify and punish deceptive advertising practices. The Court concluded that the phrase "based on smoking and health" should be narrowly construed and does not encompass the more general duty not to make fraudulent statements. Therefore, the petitioner's claims based on allegedly fraudulent statements made in the respondent's advertising and advertisements were not preempted by § 5(b) of the 1969 Act.

Therefore, in this appeal before us we are constrained to hold that the trial court's orders of May 28, 1987, and April 11, 1989, must be reversed. These trial court orders of May 28, 1987, and April 11, 1989, granted the appellee's motions for partial summary judgments with respect to all of the plaintiffs' claims that challenged the adequacy of congressionally mandated warnings and the propriety of the tobacco company's advertising and promotional schemes and practices since January 1, 1966—those orders were in error. Those orders were too broad as noted above. And as to the plaintiffs' post–1965 claims, the orders were erroneous since the federal legislation of '65 failed to preempt any valid state-law damages claims. *Cipollone, supra. See and compare Carlisle v. Philip Morris, Inc.*, 805 S.W.2d 498 (Tex.App.—Austin 1991, writ denied). Thus, we think it is clear, and

so hold, that The American Tobacco Company failed to establish as a matter of law their entitlement to the relief attempted to be granted to them under the trial court's order of May 28, 1987, and April 11, 1989.

However, appellee maintains that the "common knowledge" doctrine as announced in *Joseph E. Seagram & Sons v. McGuire*, 814 S.W.2d 385 (Tex.1991), upholds the trial court's orders and final judgment. We disagree and observe that *McGuire* is inapposite; it is distinguishable and clearly not controlling. *McGuire* will be discussed below.

■ The United States Supreme Court has recognized a basic presumption against preemption. *See Maryland v. Louisiana*, 451 U.S. 725, 746, 101 S.Ct. 2114, 2129, 68 L.Ed.2d 576, 595 (1981). Thus, in matters of law and claims traditionally regulated by state law, the presumption against preemption is much stronger and heightened. The state police powers are not to be superseded by federal legislation unless that was a clear and manifest purpose of the congressional Act. We are not to conclude and determine that Congress intended to legislate the ouster of state statutes or state law causes of action in the absence of an unambiguous congressional mandate to that exact effect. *Florida Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963).

The Labeling Act attempts to touch in a limited way upon matters of public health and public safety and the Labeling Act, therefore, regulates an area of traditional state control because the regulation of health and safety and matters relating thereto is primarily and historically a matter of local concern. *See Carlisle v. Philip Morris, Inc., supra.*

Thus concerning the question of the congressional intent to preempt the common law claims, the Austin Court of Appeals in *Carlisle* identified six factors that lead to the conclusion that the Labeling Act failed to preempt that field and to disallow such common law claims in the state courts. The six factors briefly were:

(1) the effect of any such common law claims on any congressional goals is very speculative;

(2) avoiding diverse labeling regulations is the secondary goal of the Labeling Act; the primary goal being to inform the public of the hazards of cigarette smoking—this primary goal could reasonably be said to be enhanced by permitting common law tort claims;

(3) a holding that plaintiff's claims (common law or statutory) are preempted and disallowed would leave them without any remedy for the defendant's allegedly tortious conduct;

(4) Congress could very easily have expressly and clearly preempted the common law tort claims; Congress failed to do so;

(5) the legislative history of the Labeling Act gives no indication that Congress actually intended to preempt common law tort claims; and

(6) the Comprehensive Smokeless Tobacco Health Education Act of 1986 evinces congressional intent that common law tort claims are not preempted.

The Austin Court, writing through Justice Jones, held that the Labeling Act and its legislative history did not result from any conflict with state law; therefore, the clear, manifest and unambiguous expression of congressional intent needed to uphold the preemption and disallowance of the common law tort claims was not expressed. Therefore, the common law tort claims were not preempted by the Labeling Act.

We, likewise, conclude that the Federal Cigarette Labeling and Advertising Act does not reflect a clear, manifest and unambiguous congressional intent which is necessary to preempt state common law claims for injuries, damages, or death allegedly suffered and sustained as a result of smoking cigarettes. And under the heightened presumption against preemption and disallowance as to areas of traditional state control, we thus decide that the following causes of action are simply not subject to preemption: strict liability claims for defective design and defective manufacture of cigarettes, negligence, strict liability claims for failure to warn, express warranty and implied warranty claims, and claims based on alleged misrepresentations and civil conspiracy. The preemption does apply to certain very limited classes of claims based on the failure to warn as set out in *Cipollone, supra*, —— U.S. at ——–——, 112 S.Ct. at 2624–25, 120 L.Ed.2d at 431–32. Appellants' points of error one and two are sustained. Appellee was not entitled to the summary judgment as a matter of law.

■ Appellants urge points of error three and four which complain of the trial court's granting the appellee's renewed motion for summary judgment, which judgment struck down: (a) the appellants' strict liability cause of action; (b) the appellants' negligence, willful misconduct, and gross negligence cause of action; (c) the appellants' cause of action for breach of warranty; (d) the appellants' causes of action for misrepresentation, fraud, and Deceptive Trade Practices violation; (e) the appellants' cause of action for civil conspiracy; and (f) the appellants' causes of action under §§ 321, 389, 519, and 520 of the RESTATEMENT (SECOND) OF TORTS. And further, the appellants argue that the trial court erred in granting the appellee's renewed motion for summary judgment because genuine issues of material fact existed.

Under points of error three and four, it must be noted that the plaintiffs below filed a fourth amended original petition. In that fourth petition, they asserted and alleged various causes of action including strict liability, negligence, willful misconduct, gross negligence, breach of express warranties, breach of implied warranties, fraud and misrepresentation, violations of the Texas Deceptive Trade Practices Act, civil conspiracy, actions based on the RESTATEMENT (SECOND) OF TORTS §§ 321, 389, and ultra-hazardous activities under §§ 519 and 520. The plaintiffs below sought damages recoverable under article 16 § 26 of the Texas Constitution and under the Texas Survival Statutes and under the Texas Wrongful Death Act.

ATC, as stated above, filed a renewed motion for summary judgment in which it sought dismissal of all of the claims asserted by the plaintiffs in any of their pleadings. ATC's defense was based on the language of

RESTATEMENT (SECOND) OF TORTS § 402A, citing comments i and j, in which ATC purportedly asserted that there was no duty to warn of ordinary and commonly known dangers possessed by the consumer and that specific products such as those like tobacco are neither defective nor unreasonably dangerous as a matter of law. This was the gravamen and thrust of the defendant's renewed motion for summary judgment.

Although good tobacco without any additives or foreign substances, per se, may not be "unreasonably dangerous", tobacco containing arsenic, carcinogens, toxic chemicals, unusually high nicotine content, and tars may be "unreasonably dangerous." Reports, letters, and other evidence exist in the record indicating that ATC used or experimented with the fumigation of certain Turkish tobaccos. In this fumigation process methyl bromide and other chemicals were employed. The record additionally reflects that nicotine in cigarettes is addictive and the nicotine is an agent of true physiological addiction and that nicotine is a powerful addictive substance in cigarettes. In this regard, "addiction" or "addictive" is defined as a substance that is neurologically active—being a substance that actually results in a particular exhortation of certain receptors in the central nervous system. Thus, under this record, appellee's reliance on § 402A, comments i and j, is misplaced.

The trial judge apparently granted the defendant's renewed motion for summary judgment following the reasoning and rationale of *Joseph E. Seagram & Sons v. McGuire, supra.* Nevertheless, the order granting the summary judgment stated that it was granted on all grounds urged by the appellee. Therefore, in addition to the issue of appealing the common knowledge question, this appeal implicates errors by the trial court in granting summary judgment on each and every basis and ground asserted by ATC.

### Partial Background History

Grinnell, Jr., prior to his demise, testified that he first started buying cigarettes and that about the only advertisement that Grinnell had seen or heard about had to do with Luckies, so he bought a pack of Luckies.

Grinnell smoked Lucky Strikes for only a very brief period of time. He then switched to Pall Mall Red, an unfiltered but extra long cigarette, manufactured by ATC. He smoked these Pall Malls for most of his life. He switched from Lucky Strikes to Pall Malls. When he was finally diagnosed with lung cancer, Grinnell was smoking about three packs of cigarettes a day. He testified that he knew nothing about smoking cigarettes that would have made him think that by so smoking he was doing something harmful to him and to his health until his diagnosis of cancer. He said that when he first started smoking back in about the year 1952 he had not seen anything or heard anything about any risk of lung cancer associated with smoking cigarettes. He specifically remembered reading advertisements of tobacco companies, including The American Tobacco Company and R.J. Reynolds, in the late 70's and at other times suggesting that there was no evidence of proof that cigarette smoking caused lung cancer.

Documents were obtained from ATC clearly raising the issue that ATC's advertisements were intended to give Grinnell, Jr., and other smokers the message that the greater length of the Pall Mall cigarettes filtered the smoke and that therefore the cigarette smoking itself was safe. As an example, there was an ad in favor of Pall Mall cigarettes appearing in a national magazine that represented to the user that the product, that is, the Pall Mall cigarette was of greater length and the greater length filters the smoke and that fine tobacco filters best.

We have tried to carefully examine some of the more relevant exhibits and without getting into too much detail, we notice that at least one of Pall Mall's advertisements took the position that Pall Malls had a very satisfying flavor and that the cigarette was so friendly to your taste. We opine that something that's "friendly to your taste" is certainly not harmful or unsafe and the ad says that Pall Mall's greater length filters the smoke but does not filter out the flavor. The ad admonishes the user not to give up flavor to get mildness and that for flavor and mildness fine tobacco filters best—and that Pall

Mall tobaccos are the finest quality money can buy. We determine there are a number of reasonable inferences and intendments that create express warranties and certainly implied warranties that these cigarettes are friendly and that the greater length of the cigarette filters the smoke and that for flavor and mildness that the fine tobaccos in Pall Malls filter the best.

Grinnell, Jr., testified that he tried to stop smoking on a number of occasions but could not stop smoking and that when he did temporarily stop smoking, he became very irritable. He couldn't concentrate. He couldn't concentrate on his job. He couldn't operate efficiently. He experienced a general uneasiness. Grinnell, Jr., testified that he switched from Pall Mall Red to Pall Mall Gold and Pall Mall filters because he thought that a filtered Pall Mall cigarette would be a smoother smoke and that he liked them better and that the filtered smoke would not burn his throat but when he started smoking filtered cigarettes, he began smoking more. Grinnell, Jr., had seen some cigarette advertisements from several tobacco companies, but specifically including ATC and R.J. Reynolds. After his doctors diagnosed his lung cancer, he stated that had he known cigarette smoking was so closely related to lung cancer that he would have never touched a cigarette.

The referred-to Pall Mall advertisement occurred at about the time when filter cigarettes were being introduced into the market. Therefore, the unfiltered cigarettes were losing market shares. There is in the record a motivational research study concerning the position of Pall Mall in the cigarette market. This report in general states that there is a tendency to attribute to Pall Mall certain characteristics of filtration even though it is a non-filtered cigarette. This tendency may be the result, at least partially, of advertising claims absorbed over the years of attesting to the self-filtration qualities of Pall Mall's longer length.

We have tried to carefully reseal the exhibits and the depositions in every instance. In the record (which we have carefully unsealed and resealed), there exists a press release from the president of ATC. This president took issue with what he called "loose talk" on the subject of smoking in relation to lung cancer. The president stated that the public should be reassured on the subject of smoking and health. He stated that no one has yet proved that lung cancer in any human being is directly traceable to tobacco or its product in any form.

The president further stated that believing as "we do", that cigarette smoking is not injurious to health. The president felt that a statement of reassurance to the public should be made. The statement in substance was, what the public wants to know about is whether it is true that smoking has been proved to contribute to the incidence of lung cancer. In fact, the president said, of course, that has not been so proved. In this press release other rather lengthy statements were made to the general effect that there was no proven connection between smoking and lung cancer. This statement was made by the president about one year after Grinnell, Jr., started smoking cigarettes.

In the record there is an article entitled "Why We're Dropping the New York Times". The disagreement was that the New York Times had declared it would accept cigarette ads only if the ads contained a health caution notice and "tar" and nicotine figures. The ATC ad took the position that ATC would not go along with this, that it had taken its ads off T.V. only because of the claim that this particular media, the T.V. media, may have reached large numbers of children. The ad further stated in substance that no scientist had produced clinical or biological proof that cigarettes caused the disease that they are accused of causing.

The deposition evidence of Mr. Robert Heimann is in the record. He was a former executive officer of ATC. He stated in substance that it was believed that the public was entitled to all the information that had been developed and that advertising does play a definite role in a person's selection of a particular cigarette or brand of cigarettes. Finally and importantly, Mr. Heimann stated in substance that there was no reason why an individual could not accept ATC's position that the products made by the tobacco company were not injurious to health. In sub-

stance, Mr. Heimann testified that the advertising of his company was truthful and that in general his company anticipated that users would and could rely upon it.

There was further interesting and significant testimony from this executive official to the effect that the smokers and users would not be considered to be at fault if they continued to smoke based on ATC's policy. We find:

A. No, we would not fault an individual.

Q. For continuing to smoke?

A. For continuing to smoke.

When asked specifically if advertising played a role in a person's selection of a cigarette, Heimann answered in substance, ATC hoped so when it advertised, and he thought that it was fair to assume that the expenditures of large funds for advertising does give status to a brand and influences some people to select that brand and that extensive advertising would attract new smokers and keep their loyalty. He stressed brand loyalty. A question was put to him like this:

Q. Would you expect a consumer to rely upon your advertisements?

A. Yes, our advertising is truthful and we anticipate that they would rely on it if they chose, certainly.

Q. That's sort of your promise for the consumer to expect from your product?

A. Yes, I am sure that it is.

He was further asked questions:

Q. Throughout your tenure with American, it was not only American's position but your position that cigarettes were not injurious to health; is that correct?

.    .    .    .    .

A. Yes, that's so.

Q. That's something American wanted the public to believe, is that correct?

A. Yes.

Q. It's a statement American Tobacco placed great reliance upon?

A. We issued that statement. Yes. Certainly, we wanted them to believe.

One exhibit before us bears the date of December 7, 1959. This was a memorandum in which the executives of ATC were advised, inter alia, that in general there were many and repeated correlations of smoking and lung cancer and until these correlations are fully explained, it is doubtful whether most scientists would accept the "disproof" claim that there was no correlation between cigarette smoking and lung cancer. This memorandum urged that at that time a dramatic statement of disbelief should be written for general public consumption for issuance either by Mr. Hartnett or Mr. Richards and that such a statement could discuss in forceful language the non-scientific or propaganda influence which have been brought to bear to create the "cigarette scare". It was suggested that the president of ATC could conceivably send a special letter to the stockholders bringing the stockholders up to date on smoking and health and that such a letter to the stockholders might be worded so dramatically that it would bring attention and would attract media attention.

There exists in the record also an additional memorandum directed to Mr. R.K. Heimann, vice-president, from the assistant marketing director of ATC. This memorandum noted that the tobacco industry in general had been faced with declining sales and declining profits and possible forthcoming governmental regulation. The memorandum urged that the company's management ought to take steps to help destroy the image created by the American Cancer Society in connection with its research in the smoking and health area and that the industry should immediately enlist the aid of the American Statistical Association to evaluate this research to determine to what extent the results can be classified as significant. This memorandum took the position basically that perhaps the American Cancer Society's work should be labeled as an interesting experiment in numbers, proving nothing.

There exists another exhibit that makes reference to arsenic. It is in the form of a letter from the director of research to Mr. Robert K. Heimann as the executive assistant of ATC located on Fifth Avenue in New York City. The letter raises the issue that

admittedly arsenic is not an experimental carcinogen like benzpyrene and arsenic's presence in cigarette smoke has long been regarded as a carcinogen in some form but that the quantity of arsenic is very small. There exists in the record many other exhibits. We are persuaded that the appellee had the burden of establishing as a matter of law that there existed no genuine issue of a material fact as to one or more of the essential elements of the plaintiffs' various causes of action. We determine that the appellee has failed to do so, especially in regard to points of error three and four. *See and compare Rogers v. R.J. Reynolds Tobacco Co.,* 761 S.W.2d 788 (Tex.App.—Beaumont 1988, writ denied). Any and all reasonable inferences concerning the existence of a material fact question must be resolved against the movant in a summary judgment proceeding and all the evidence and all of the inferences from the evidence must be viewed in a light that is most favorable to the non-moving party. We must accept as true non-movants' evidence. Even doubts must be resolved in favor of the non-movants.

Under this record for summary judgment purposes, we conclude that it is shown that Grinnell, Jr., began smoking at an early age and he smoked cigarettes manufactured by ATC for a long time and, indeed, for the rest of his life up until the time he was diagnosed with lung cancer in July of 1985. Grinnell, Jr., did not think or believe that cigarettes were harmful to his health. He became addicted to cigarettes. He couldn't quit smoking cigarettes. He was addicted because of the nicotine and that his lung cancer was caused by smoking the cigarettes of ATC.

Under this record we opine that the dangers and hazards involved were not common knowledge. And, indeed, there is some evidence that demonstrates that the appellee with certain other cigarette manufacturers engaged in a disinformation campaign to assure the public in a general way that their cigarettes were simply not injurious to health. However, the appellee places heavy reliance upon the common knowledge defense, citing *Joseph E. Seagram & Sons v. McGuire, supra.* We perceive the *McGuire* case is not controlling here because the Tex-

as Supreme Court there held that the defendant was not excused from warning of all the product's dangers but only those of which the public had common knowledge. Certainly Grinnell, Jr., had no such common knowledge of all of the product's dangers. Even if a finding that the dangers of cigarette smoking were common knowledge had been made, this would not excuse the appellee totally from any and all tort claims other than its failure to warn. Appellee disputes this.

Interesting and significant is the holding of the Supreme Court in *McGuire:* that from ancient times the danger of alcoholism from prolonged and excessive consumption of alcoholic beverages has been widely known and recognized. Consequently, Seagram had no duty to warn or instruct of this particular danger. In this appeal the dangers are several and different.

We glean that cigarettes and cigarette smoking do not go back to ancient times. A date of around 1850 or later is widely accepted as the date when cigarettes were first used. *McGuire* and RESTATEMENT (SECOND) OF TORTS 402A, comments i and j, are not controlling of the appeal sub judice. As we understand the *Cipollone* decision in the United States Supreme Court, the Supreme Court has simply ruled that no attack or challenge may be made as to the adequacy of the prescribed warning on cigarette packages, billboards, advertisements of any type containing the prescribed warning and further, the opinion stands for the proposition that the states or state law cannot neutralize the adequacy of the prescribed warnings. This prohibits the states through health codes or even federal agencies from challenging the adequacy of the warning. We therefore sustain the appellants' points of error three and four.

By like reasoning we also sustain appellants' point of error number four, because, as noted above, we are persuaded that the trial court erred in granting the appellee's motion for summary judgment because there did exist in the record genuine issues of material facts.

■ We decline to sustain appellants' point of error number five, however. The trial court did not err in denying the plain-

tiffs' motion for summary judgment. Under point of error number five the plaintiffs take the position that the trial court should hold the defendant liable as a matter of law because, it is claimed by the plaintiffs, that it is beyond dispute that cigarettes cause cancer and are unfit for human consumption. We do not think that that was proven as a matter of law as to Grinnell, Jr. We overrule appellants' point of error five. However, in doing so, we do not retreat from our opinion in *Rogers v. R.J. Reynolds Tobacco Co., supra.*

For the reasons stated above, we reverse the judgment and remand the cause for a trial on the merits. We sustain in full all the appellants' points of error except point of error five. As we construe the *Cipollone* decision, the plaintiffs are limited to the extent, but only to the extent, that they cannot attack the adequacy of the warnings on cigarette packages and advertising and promotions and they cannot rely upon state law to try to neutralize or diminish the effect of these particular warnings. But the warning issues involve, as we understand it, only one leg of the three-legged stool of products liability. That one leg diminishes very limitedly the obligation to not defectively market a product. This limitation does *not* affect the duty to not defectively design and not to defectively manufacture a product. The warning is only a portion of the question of whether or not the product was defectively marketed—and nothing else.

Under this lengthy record, following accepted standards of review of summary judgment proceedings, we conclude that appellee was not entitled to the orders and final judgment it obtained below. Also, we conclude that appellants raised numerous genuine issues of material facts on each cause of action pleaded in the appellants' live pleadings.

As an additional, separate ground, having found error and having reversed the judgment, we remand the case for a full trial on the merits *on all issues* in the interest of justice in accordance with this opinion. It is so ordered.

REVERSED AND REMANDED.